State of Iowa v. Noah J. Thomas, Appellant.

Evidence: *Seduction.* A conviction for the crime of seduction will not be sustained, where, although the defendant paid his attention to the prosecutrix for a time, yet the letters which passed between them contained no reference to an engagement or any improper act, and the associates of the prosecuting witness and her conduct with other men indicate that she was not a chaste woman. See opinion for other facts.

*Appeal from Franklin District Court.*—Hon. B. P. Birdsall, Judge.

Wednesday, December 15, 1897.

Defendant was indicted for the crime of seduction, was convicted, and appeals.—*Reversed.*

*Taylor & Evans* for appellant.

*Milton Remley*, attorney general, and *Jesse A. Miller* for the state

Kinne, C. J.—I. Counsel for appellant contends that the evidence does not sustain the verdict. There are certain facts in the case which are either admitted or established beyond any reasonable doubt, viz.: That Grace Porter, the prosecuting witness, went to the house of Mr. and Mrs. Hemm to do housework June 12, 1895, and continued to work there up to and after she claims to have been seduced; that the defendant began working for the same Mr. Hemm about July 11, 1895, and so continued until January 8, 1896, when he went on a visit to his parents, in Wisconsin. He returned from Wisconsin the March following, and resumed his work at Hemm's. Several other men were working for Hemm at the same time, and all of them, including the defendant, slept upstairs. The prosecutrix also slept upstairs, and in a room through which all of these men had to pass in going to their room. About the fifteenth to twentieth of September, 1895, defendant and prosecutrix went from the Hemm place to Belmond and Meservey together, and returned early on the following morning. Prior to this she had ridden with the defendant to Alexander, and also to the place where one Butterwick worked, about two miles east of Alexander. At another time she rode with him to a point about eighty rods west of Alexander, where they met Butterwick, and she left defendant, and got in Butterwick's buggy. He once gave her a pair of shoes, let her have money to go to Hampton, and at another time gave her a dollar. He sat up with her

often, was seen to embrace and kiss her, and, after the Belmond trip, except as to the matter of carnal knowledge of each other, they seem to have conducted themselves as lovers usually do. It appears also that from some time in September until in January, 1896, the prosecutrix had no regular company except the defendant. It is established beyond a doubt that the prosecutrix had carnal connection with some one in the fall of 1895, and that on December 29, 1895, she had a miscarriage. She claims that her seduction was accomplished by the defendant on November 6, 1895, under a promise of marriage and protestations of love and affection on his part, and that thereafter they had carnal intercourse five times, at intervals of a week or over apart. The medical evidence showed that pregnancy had existed for not less than two nor more than three months, and, if this time be computed from the date of the miscarriage (December 29, 1895), conception must have taken place as early as October 30, 1895. She says that the night the defendant accomplished her seduction he was in her room an hour. The men who slept in the room with the defendant never knew of his visiting her room after he had retired for the night. She claims he came to her bed from his room some time after he had gone to bed with the other men in their room. She testified that she missed her monthly sickness November 29, 1895, but said nothing about it. A month later she claims to have had a miscarriage, and, though seeing the defendant daily, she did not disclose to him her condition, according to her own evidence, until January, 1896, about the time he went to Wisconsin. She testifies that, on January 1, 1896, defendant asked her if there was anything wrong, and she told him "how she felt, and told him, if such was the case, it was all laid at his door." In other words, she was then, according to her own evidence, intimating to him that she thought she was in the family way, when she now claims to have had a miscarriage two days before. During the absence of the defendant in Wisconsin, several letters passed between them, and she admits that "there was nothing said in any letter by either of us about any improper act. Our engagement was not mentioned in the letters."

The defendant admits paying his attentions to the prosecuting witness for a time, denies any engagement or promise of marriage or profession of love, and denies that there were ever any carnal relations between them. He says she never said anything to him about being in the family way, or about having a miscarriage, and he knew nothing of it until she testified to it in court. Some of the facts above recited are, in our judgment, hardly reconcilable with the

claim of the prosecutrix that defendant seduced her or had carnal connection with her. After all the protestations of love and promises which she says he made in order to induce her to submit to his wishes, it is strange she could, according to her own admissions, conceal from him for weeks the fact that she was with child. Stranger yet that when he, as she claims, sought from her information as to her condition, she, although knowing that she had already had a miscarriage, said nothing about it until days afterwards. Counsel for the state seem to think that it was natural that the letters which were exchanged between them should be silent as to their marriage engagement or their acts of illicit intercourse. She was, when she says this seduction took place, a woman twenty-one years of age. It would have been the natural,—the usual,—thing between lovers who were engaged to speak of it in their correspondence. It does not require much knowledge of human nature to acquaint one with the fact that engaged lovers, who are separated for a time, and who carry on a correspondence, are prone to often refer to the time when their hopes are to be consummated by the marriage, and in various proper ways to refer to the fact of the existing engagement. It is to our minds an exceedingly strong circumstance tending to show that no engagement ever existed, and many of the recited facts make the defendant's guilt a matter of serious doubt.

We are at a loss to determine how the jury could have found, as they must, under the instruction, that this prosecutrix was of previous chaste character. It appears without conflict that in the summer of 1895 she was intimate with one Miss Kruse, who was, according to the undisputed evidence, a woman of bad reputation. According to her letter of date June 12, 1895, to one Mr. Butterwick, she was staying with this woman. In that letter, after asking Butterwick to get Grant, and come and see them, between 9 and 10 o'clock at night, she says it is "pleasure we are fishing for, and that we will gain, for I am going to make up for lost time," and signs herself "Lady Grace." In company with Miss Kruse, the prosecutrix went one Sunday to the town of Alexander. There they were joined by this same Butterwick and one Palmer. Prosecutrix testified that they all went to church; that after church she went back to get her handkerchief, and then they went for a drive, Butterwick and she being in one buggy, and Palmer and Miss Kruse in another; that they drove until two o'clock in the morning, or after. They then came back to the hotel, and could not get in, and they then drove in various directions until daylight. Palmer testifies that church was out about nine o'clock, and after that they all walked around town for a while, and then Butterwick and prosecutrix went into the church, and he

does not know whether they came out of the church then or not. He and Miss Kruse left them there, and saw no more of them until 3 o'clock in the morning, when they met on the street; that there was no all-night ride, and no ride at all prior to 3 o'clock in the morning. Palmer testifies also that he had a conversation with prosecutrix after the preliminary examination of the defendant about this case, and she told him what she had sworn to, and wanted him to testify to the same thing. The prosecutrix did not deny this attempt to induce Palmer to tell the same story she had told. Now, if Palmer told the truth, the prosecutrix did not, in her evidence, as to the night she put in with Butterwick; and if she did not, and, in addition to having testified falsely, was endeavoring to induce Palmer to do the same, to bolster up her testimony, we think it must be conceded that her testimony as to other matters may well be looked upon with suspicion, in view of the contradictions and the improbability of its being true. If she did not solicit Palmer to swear as he says, she would be quick to deny it, and to take the stand in her own behalf. Butterwick was in court, and, if her story was true as to how he and she spent the night, it would have been the most natural thing to do to have herself denied Palmer's testimony, and sustained her own by Butterwick. No effort was made so to do. During her early acquaintance with the defendant, and prior thereto, she wrote several letters to this man Butterwick. Many expressions in these letters, unexplained, and in connection with other facts and circumstances, indicate that the prosecutrix was not a chaste woman. Some of the letters were explained by her as a witness on the stand. Others, which were of more doubtful character, she did not attempt to explain. It is admitted that one Piatt, who lodged in the same house with the prosecutrix, and during the time she claims the engagement between her and the defendant existed, did, late at night, and after the prosecutrix was in bed, visit her, and sit on the edge of the bed, and talk to her for some time.

In view of the facts disclosed by this entire record, some of which we have set forth, we are forced to the conviction that the evidence of the prosecutrix is in material matters untrue, as it is certainly contradictory. Other material facts which she testifies to are, as we have endeavored to show, unusual, unnatural, improbable, and, in view of all of the other established facts in the case and her claims as to the seduction and marriage engagement, ought not to be accepted as true. While it is the duty of courts and juries to protect woman against the wiles of the seducer, and to punish the guilty, a man ought not to be sent to the penitentiary for the crime of seduction upon evidence so unsatisfactory as to his guilt as that

in the record before us. When the evidence is all analyzed and given its proper force, it cannot be said that it could satisfy any fair-minded man of the defendant's guilt beyond a reasonable doubt. Indeed, to our minds, properly viewed, the defendant's guilt does not appear by a preponderance of the evidence.

II. Several errors are assigned upon rulings of the court upon the introduction of evidence, the giving of instructions, the misconduct of the jury and of the county attorney. In view of the conclusion reached, we need not consider the questions just stated. We hold that the evidence is not sufficient to warrant the conviction of the defendant, and the court should have sustained the motion for a new trial.—REVERSED.